**ALANA L. MCMAINS**
California State Bar No. 285942
**LAW OFFICE OF ALANA MCMAINS**
402 W. Broadway Ste. 400
San Diego, California 92101-5030
Telephone: (619) 615-4229
alana@mcmainslaw.com

Attorney for Plaintiff

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| A.C., an individual,<br><br>Plaintiff,<br>v.<br><br>UNITED STATES OF AMERICA (FEDERAL BUREAU OF PRISONS); STEPHEN SILVA; RAY J. GARCIA, individuals; and DOES 1 through 10, inclusive;<br><br>Defendants. | Case No.: 23-CV-4691<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. This action stems out of Plaintiff A.C.'s repeated sexual harassment and abuse at the hands of those entrusted with her care when she was in custody at the Federal Correctional Institution Dublin ("FCI DUBLIN"), an all-female prison run by the Federal Bureau of Prisons ("BOP").

2. When she began her sentence, Plaintiff had no idea she was entering an environment so rampant with sexual abuse and corruption that guards and prisoners alike had nicknamed it "the rape club."

3. In approximately 2020, the Federal Bureau of Investigation ("FBI") began an investigation into the constitutional and human rights abuses at FCI

DUBLIN. Since the inception of the investigation, eight BOP COs have been charged with sex crimes. Seven have convicted, including Defendant Warden Ray J. Garcia ("GARCIA"), who received 70 months custody for multiple counts of sexual abuse of a ward. With GARCIA in charge of FCI DUBLIN, COs had free rein to get away with horrifying acts of abuse.

4. Defendant Stephen Silva ("BOP") took advantage of his position as a CO at FCI DUBLIN to prey on the vulnerable, incarcerated women ostensibly under his care. He sexually assaulted Plaintiff on numerous occasions, as well as other women at the facility.

5. As a result of Defendants' actions, Plaintiff suffered numerous and substantial emotional, physical, and personal injuries that continue to affect her today, and likely will for the rest of her life.

**JURISDICTION AND VENUE**

6. Plaintiff's claims arise under the United States Constitution, the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA"), and California statutory and common law. The Court has federal question jurisdiction over Plaintiff's federal claims, both constitutional and statutory, pursuant to 28 U.S.C. § 1331. Further, the Court has supplemental jurisdiction over Plaintiff's claims under California law pursuant to 28 U.S.C. § 1367 because these state-law claims arise from a common nucleus of operative fact with Plaintiff's federal claims.

7. This Court has personal jurisdiction over Defendants. Upon information and belief, all individual Defendants are citizens of, and domiciled in, California. The Court has specific jurisdiction over Defendants because they committed the actions and commissions forming the basis for each claim against them in California.

8. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1402(b). As noted above, Defendants' actions and omissions that give rise to Plaintiff's claims occurred at FCI DUBLIN, located

at 5701 8th St. in Dublin, California, which is within the Northern District of California.

**INTRADISTRICT ASSIGNMENT**

9. Pursuant to Civil Local Rules 3–2(d) and 3–2(h), Plaintiff's action is properly assigned to the San Francisco Division of this District because the action arises from actions and omissions occurring in Alameda County, California, where FCI DUBLIN is located.

**PARTIES**

10. Plaintiff is an individual and citizen incarcerated in Dublin, California. She was in custody at FCI Dublin at all times relevant to this action. As a victim of sexual assault as defined by section 115.6 of the Prison Rape Elimination Act ("PREA"), she is using her initials to protect her privacy.

11. Defendant United States of America ("the USA") is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts of its employees and servants.

12. The USA is a governmental entity that is comprised of departments and agencies, including the BOP. These governmental entities are one and the same and will hereinafter be referred to collectively as "the UNITED STATES."

13. The UNITED STATES owns, operates, managers, and oversees numerous prisons, including FCI DUBLIN.

14. Defendant UNITED STATES, acting through its secretary, supervisory employees, employees, agents, and staffs, including those at the BOP, hired individual Defendants GARCIA, SILVA, and DOES 1 through 10, inclusive, as employees.

15. While performing the acts and omissions that Plaintiff alleges in this Complaint, GARCIA and SILVA were acting within the scope of their official employment and authority, whether actual or apparent.

16. At all times relevant herein, GARCIA, SILVA, and DOES 1 through

10, inclusive, were citizens of California.

17. Plaintiff is ignorant as to the true names, identities, and capacities of Defendants DOES 1 through 10, inclusive. Therefore, Plaintiff sues these Defendants via fictitious names. When the true names, identities, or capacities of such fictitiously designated Defendants are ascertained, Plaintiff will seek leave of this Court to amend the Complaint to assert their true names, identities, and capacities, as well as any specific relevant allegations.

18. Upon information and belief, Defendant DOES 1 through 10, inclusive, were correctional officers ("COs") and/or employees of the UNITED STATES. At all times relevant, these Defendants were acting within the scope of their official employment and authority, whether actual or apparent.

19. Each DOE Defendant is responsible, in some manner, for the events and occurrences delineated in this Complaint, thereby legally causing the injuries and damages to Plaintiff as will be alleged.

20. All Defendants were at all times responsive for the custody, care, control, direction, safety, and wellbeing of Plaintiff.

## THE PRISON RAPE ELIMINATION ACT

21. Recognizing the severe problem of rape and sexual assault within correctional institutions, Congress passed the PREA in 2003. *See* 34 U.S.C. § 30301, *et seq.* The statute created the National Prison Rape Elimination Commission, which was tasked with establishing national standards for preventing and responding to sexual abuse of inmates. These standards became effective in August of 2012 and were published in the Federal Register.

22. PREA regulations are mandatory for all employees of the BOP. The PREA required the BOP to create and maintain a strict "written policy mandating zero tolerance toward all forms of sexual abuse and sexual harassment outlining [the BOP's] approach to preventing, detecting, and responding to such conduct. Periodic audits of all federal correctional facilities is required in order to ensure

compliance with the standards put forth in the regulations.

23. The PREA requires that all staff "report immediately" and "knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in the facility," as well as any "retaliation against inmates or staff who reported such an incident," as well as any "staff neglect or violation of responsibilities that may have contributed to an incident or regulation." 28 C.F.R. § 115.61.

24. It further mandates that prison officials assess whether a prison inmate is subject to a substantial risk of imminent sexual abuse, and if it is determined that the substantial risk exists, the prison must take immediate action to protect the inmate. *Id.* § 115.62.

25. Pursuant to the PREA, all employees of the BOP that have contact with inmates must be trained on the following items: (1) zero-tolerance policy for sexual abuse and sexual harassment; (2) responsibilities regarding detection, reporting, and responding to sexual abuse; (3) inmates' right to be free from sexual abuse and sexual harassment; (4) inmates' and employees' rights to be free from retaliation for reporting sexual abuse or harassment; (5) the dynamics of sexual abuse and sexual harassment in confinement; (6) the common reactions of sexual abuse/assault victims; (7) how to detect and respond to signs of threatened and actual sexual abuse; and (8) how to avoid inappropriate relationships or situations with inmates.

26. The statute states that presumptive disciplinary sanction for staff that sexually abuses inmates is termination of employment. *Id.* § 115.76.

27. The PREA also requires the BOP to offer medical and mental health care to all sexual abuse victims. *Id.* § 115.83.

**THE CULTURE OF SEXUAL ABUSE AT FCI DUBLIN**

28. Despite the long-established requirements of the PREA, personnel at FCI DUBLIN engaged for years in a pattern and practice of engaging in sexual

abuse of inmates and then covering it up.

29.   FCI DUBLIN had an institutional culture of defiance of the PREA. COs regularly turned a blind eye towards rampant sexual assault and abuse of female inmates.  The culture prioritized loyalty to fellow COs over the duty under the PREA to prevent sexual assault and assist victims.  Inmates who spoke out were regularly retaliated against, also in violation of the PREA.

30.   This culture was particularly entrenched during the period between December 2018 and November 2020, when GARCIA was the associate warden at FCI DUBLIN.

31.   As the warden, GARCIA was responsible for the safekeeping, care, protection, discipline, programming, health, employment, and release of inmates incarcerated at FCI DUBLIN.  GARCIA was also responsible for hiring, training, supervising, and managing staff.  He had disciplinary authority over all employees working at FCI DUBLIN as well as all inmates incarcerated there.  GARCIA was further in charge of determining, enacting, and employing operating procedures and policies for FCI DUBLIN.

32.   GARCIA was required to manage FCI DUBLIN's employees and inmates in accordance with BOP policies and procedures, as well as in full compliance with federal and state laws.  GARCIA had a duty to not violate the constitutional rights of the women incarcerated at FCI DUBLIN.

33.   One of GARCIA's responsibilities was to help ensure that FCI DUBLIN was in compliance with the PREA.  He led training for staff regarding the prevention and detection of rape within the facility, including training on the proper procedures for handling complaints or suspicions of sexual misconduct at the prison.  All employees of FCI DUBLIN, including GARCIA, were specifically notified that any emotional, physical, sexual, or financial involvement with inmates or former inmates was contrary to BOP policies and/or violated federal law. GARCIA was also tasked with conducting the annual audits of the prison required

under the PREA, thus making him responsible for investigating, documenting, and reporting any sexual assaults or abuse that occurred at FCI DUBLIN.

34. GARCIA failed to comply with the PREA throughout his tenure at FCI DUBLIN. He failed provide sufficient or effective training to the COs, staff, and independent contractors working with female inmates. He further failed to conduct adequate and accurate audits of the facility, because he was very aware that he himself, along with many others working at FCI DUBLIN, was personally engaging in sexual abuse of the incarcerated women. GARCIA also, as part of his purposeful coverup of the epidemic of sexual abuse at the prison, failed to properly respond to or investigate complaints and/or allegations of sexual assault that he received as warden.

35. GARCIA sexually assaulted multiple women under his care. He groped women, forced them to pose nude, and verbally degraded them. GARCIA even continued to sexually harass women once they had been sent to BOP-controlled halfway houses, sending pictures of his penis to one. He intentionally used his power as warden to take advantage of his victims, promising them preferential treatment if they complied with his demands.

36. In September of 2021, GARCIA was indicted for multiple counts of federal felony sexual abuse of a ward, based on sexually assaulting inmates and having naked photographs of inmates on his government-issued cell phone. He was convicted by a jury trial in March of 2023. When sentencing him to 70 months, the U.S. District Judge Yvonne Gonzalez Rogers declared that FCI DUBLIN was a "cesspool" and that GARCIA not only "did nothing about it," but actually "went along with the ride and enjoyed the cesspool [him]self."

37. GARCIA's sexual misconduct was known to others at FCI DUBLIN, and it set an example that COs and other staff could get away with abusing the inmates. GARCIA modeled poor behavior, and he intentionally ignored other employees' acts of sexual abuse that he either knew of or should have known about.

Individuals working at FCI DUBLIN knew, through observing GARCIA's conduct, that sexual abuse of women was acceptable and would not be punished. Thus, GARCIA ratified the illegal conduct of his inferior officers.

38.    At least seven other FCI DUBLIN employees engaged in the sexual abuse of female inmates, according to the Department of Justice.[1]   While the investigation remains ongoing, the following individuals have been charged:

(a)    CO Ross Klinger pleaded guilty to sexual abuse of a ward in February of 2022.

(b)    Chaplain James Highhouse pleaded guilty in February of 2022 and was sentenced to 84 months custody.

(c)    Enrique Chavez pleaded guilty in October of 2022 and was sentenced to 20 months prison.

(d)    CO John Bellhouse CO John Bellhouse was convicted in June of 2023 by a jury on five counts of sexually abusing two female inmates between 2019 and 2020.

(e)    CO Darrel Smith was indicted on April 13, 2023 and his prosecution is ongoing

(f)    CO Nakie Nunley pleaded guilty in July of 2023 and awaits sentencing

(g)    CO Andrew Jones pleaded guilty in July of 2023 and awaits sentencing

39.    Upon information and belief, many more COs, staff, and contractors engaged in sexual abuse of women, even though they have not been indicted. Many of those additional COs are either on administrative leave pending investigation or were transferred to another BOP facility. As of May 2022, there were 17 current

---

[1] *See* U.S. Dept. of Justice, *Two More Dublin Federal Correctional Officers to Plead Guilty to Sexually Abusing Multiple Female Inmates* (Jul. 14, 2023), https://www.justice.gov/usao-ndca/pr/two-more-dublin-federal-correctional-officers-plead-guilty-sexually-abusing-multiple.

or former FCI DUBLIN employees being investigated for sexual misconduct by either the Office of the Inspector General or the BOP.

40. GARCIA, SILVA, and the other abusers at FCI DUBLIN all were aware that the security camera system at FCI DUBLIN was inadequate. There were multiple areas that would not be captured by the surveillance camera, so they intentionally brought women to those locations to sexually abuse them.

**SILVA'S SEXUAL ABUSE OF PLAINTIFF**

41. Plaintiff became an inmate at FCI DUBLIN in approximately July of 2018. She was 29 years old.

42. During her intake screening with the Psychology Services department, the BOP psychologist conducted an assessment of Ms. Castillo to see if she had any risk factors for being sexually victimized. The psychologist noted several demographic risk factors that have been associated with a greater chance of being a victim of sexual assault: (1) Plaintiff was physically attractive; (2) Plaintiff had a childhood history of sexual abuse; (3) Plaintiff had a history of being sexually assaulted; and (4) Plaintiff had no history of any violent crimes. The psychologist also assessed whether Plaintiff had any "protective factors" that would reduce the risk. The sole protective factor that the psychologist found was that PLAINTIFF was older than 21.

43. Plaintiff was housed in the F Unit. She very quickly realized that FCI DUBLIN was a hostile and dangerous environment rife with sexual harassment.

44. The COs were frequently degrading to the women, sexually harassing them and verbally abusing them. It was not uncommon for the COs to fly into a fit of rage and destroy the women's property.

45. Frequently, the COs would make sexual comments to women, inquiring and speculating about their sex lives, or assessing and praising their bodies. Some COs would walk in on women while they were in the shower, just to show that they could. COs would enter women's cells and demand a strip search,

under the pretext of a minor infraction.

46.    Further, many of the COs were engaged in nonconsensual sexual activity with women at the prison.  These actions were well known to all the inmates at FCI Dublin, and they therefore lived in a daily atmosphere of fear.  Though some women reported what happened, their complaints would be ignored.  Other women did not even attempt to complain, as the COs had threatened them and warned them that nobody would believe the word of an inmate against a guard.

47.    Two COs in particular seemed to target Plaintiff for harassment: Sergio Saucedo and Nicholas Ramos.  Both had reputations for being mean and engaging in sexual acts with women.  They frequently verbally harassed Plaintiff, leaving her in a constant state of anxiety and shame.

48.    Eventually, both COs would be placed on administrative leave due to suspicions of misconduct.  Sausedo is currently a defendant in at least one civil action accusing him of sexual abuse.  Ramos committed suicide after being placed on administrative leave.

49.    While things were difficult at FCI DUBLIN for Plaintiff, her situation would become drastically worse when CO SILVA was transferred to the F Unit where Plaintiff lived.

50.    SILVA was another CO with a reputation for engaging in sexual "relationships" with the inmates.  Upon information and belief, SILVA was transferred out of prior assignment in the Special Housing Unit due to allegations that he had sexual contact with another inmate.

51.    Most of the inmates on F Unit were happy to have SILVA as their new CO, because he also had a reputation for being very lax about the rules.  This was a welcome change after the verbal abuse they'd received from the prior CO.

52.    SILVA was stationed at the F Unit from Wednesday through Sunday, 2:00 p.m. to 10:00 p.m.  He was the sole CO stationed in that unit, so there was nobody to notice or monitor his activity.  SILVA rarely walked around the unit to

check on the women, as he was supposed to.  Instead, with the exception of two inmate "counts" per shift, SILVA primarily sat at the guard station watching movies.

53.    In early August of 2020, SILVA began to flirt with Plaintiff.  She was nervous about the attention, but she did not want to get on his bad side.  She agreed to start meeting him every night at the guard station, after the 9:00 p.m. count.  SILVA did not lock the cell doors nor did he enforce the rule that inmates were not supposed to leave their room after the evening count, so Plaintiff was able to get away with it.  And SILVA knew that the camera did not face the lobby where the guard station was located.

54.    On or about September 16, 2020, after count, Plaintiff went to meet SILVA at the guard station.  He continued to be flirtatious with her and the conversation turned sexual.  SILVA showed her that he had an erection, and Plaintiff performed oral sex on him.

55.    Plaintiff was in shock when she returned to her cell; she could not believe what had actually happened.  But then another feeling arose: a fear that they would get caught and she would get in trouble. She decided to write a letter to SILVA telling him that she did not want to get caught and was scared.  She dropped it off at the guard station.

56.    SILVA sent a reply note the same day.  He told her not to worry or be hard on herself.  He flattered her, writing, "You have more great qualitys [sic] about yourself and being beautifull [sic] is just a bonus to all of it."  He then expressed worry that Plaintiff would "lose interest" in him because they weren't going to see each other for awhile; he said that would be "the true test."  SILVA then wrote, "Been wondering what you taste like everywhere and what our bodys [sic] will feel like against each other."  He then pivoted to a veiled threat that if she did not continue to show interest in him, he would move on to a different female inmate.  "Don't forget me too fast. All these other girls around here can probably be pretty

persuasive." SILVA wished her good dreams, and then closed the letter by writing "#MEINYOU." ["Me in you," written in the form of a hashtag like those commonly used on social media.]

57.    Plaintiff had mixed feelings, as she appreciated the compliments and the romantic attention after being treated so cruelly for almost two years. But she knew that what was happening was wrong. For that reason, despite SILVA's instructions to flush the letter he had written down the toilet, Plaintiff secretly kept it.

58.    For the next few weeks, Plaintiff kept meeting up with SILVA. They did not have many oral sex at the guard station, but SILVA would rub her arms, grab her chin, and fondle her breasts.

59.    In late September of 2020, SILVA told Plaintiff she should meet him in the orderly's closet near the E Unit, so they could have vaginal sex. SILVA thought it was a safe place, but Plaintiff felt like they would be caught by the E Unit officer. The meeting never happened.

60.    In around October of 2020, SILVA was transferred from F Unit to B Unit. The woman who SILVA had allegedly had sexual contact with prior to Plaintiff had recently moved to B Unit. SILVA would give the woman "gifts" such as smuggling in contraband for her. It was well known at FCI DUBLIN that one benefit of engaging in sexual activity with a CO was that he might bring you items that were difficult or impossible to obtain in the prison. Plaintiff suspected that SILVA requested the transfer so that he could be closer to that woman.

61.    While SILVA was assigned to B Unit, Plaintiff had minimal interaction with SILVA. In around December of 2020, however, SILVA was transferred again, this time to the "yard." The yard was a main yard area that everyone had to walk through to get to places like the medical office.

62.    Plaintiff began volunteering to work on the yard in approximately January of 2021. She noticed that "the other woman" also worked there, and some

days that woman would turn Plaintiff away, telling her there was no more work. Plaintiff suspected this was because she was again having sexual relations with SILVA.

63.    But in February of 2021, SILVA started making sexual advances toward Plaintiff again.  He was the only officer working the yard some days, and he told Plaintiff she should come to the bathroom in his office, which had no windows.  Because other inmates were working the yard, they pretended that Plaintiff was entering his office to clean the bathroom.  Plaintiff performed oral sex on SILVA in his bathroom three times: February 9, 16, and 17 of 2021.

64.    The encounter on February 17 was the last sexual contact between them.  Another inmate told Plaintiff that SILVA was "in love" with his former inmate "girlfriend." Plaintiff felt degraded by the way SILVA had used and taken advantage of her.

## THE AFTERMATH

65.    SILVA was put on administrative leave from the BOP in the middle of 2021.  Plaintiff heard that it was because he had smuggled drugs into the facility.

66.    Things continued as usual at FCI DUBLIN for awhile, until the FBI investigation began.  The FBI encountered more and more evidence of widespread sexual abuse at the facility, and it empowered more victims to come forward.  But as COs started getting indicted on federal charges, the environment became tense and hostile.

67.    With so many COs getting arrested, placed on leave, or transferred, the remaining COs were resentful and angry toward the women who they believed "snitched" on their coworkers.  The COs began engaging in retaliatory behavior against the women, including but not limited to locking women in special housing units for solitary confinement, transferring them away from their families, giving them disciplinary "shots" that affected their good time credits, and conducting random, baseless searches during which they would violently tear up the women's

property.

68. As the scandal gained more media attention, U.S. Senate conducted a bipartisan investigation into sexual abuse of female prisoners in BOP custody. In December of 2022, the U.S. Senate Permanent Committee on Investigations, Committee on Homeland Security and Government Affairs released their final report.

69. The report stated that BOP employees have sexually abused female prisoners in at least two-thirds of facilities that have held women over the last decade. It additionally noted that BOP management failures and seriously flawed investigative practices are both to blame for this terrible failure to successfully implement the PREA.

70. The report noted that FCI DUBLIN had failed to detect the culture of BOP employees sexually abusing female detainees before, during, and after abuer occurred. It noted that the BOP does not systematically analyze complaint date to detect potentially problematic employees or institutions. The BOP also failed to hold employees accountable for their misconduct, with a backlog of approximately 8,000 internal affairs cases alleging employee misconduct, some of which have been pending for more than five years.

71. The report also pointed out the inadequacy of the PREA audits in detecting or preventing sexual assaults of inmates. It noted that FCI DUBLIN's PREA audits all came back clean, despite the known sexual misconduct that the guards were engaging in during that time period. It asserted that FCI DUBLIN had a recurring problem of sexual abuse of female prisoners, and that there was evidence that problem had been ongoing since the 1990s. It concluded that the BOP had failed to take agency-wide action to address the problem.

72. In October of 2022, C.A. was transferred to a different BOP facility. While there, she had a stress-induced heart attack. She further suffers myriad psychological symptoms.

73. As of May 4, 2023, C.A. is back at FCI DUBLIN. She lives in a constant state of fear of sexual assault or retaliation.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

## *BIVENS* CLAIM FOR VIOLATION OF THE EIGHTH AMENDMENT CRUEL AND UNUSUAL PUNISHMENT SEXUAL ABUSE, DELIBERATE INDIFFERENCE TO PLAINTIFF'S SAFETY, AND FAILURE TO PROTECT

**(Against Defendants GARCIA, SILVA, and DOES 1 through 10)**

74. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

75. This constitutional claim is brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

76. The Eighth Amendment of the United States Constitution guarantees Plaintiff the right to be free from cruel and unusual punishment. Sexual abuse of a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment, as it serves no legitimate penological purpose.

77. Federal law recognizes that an inmate cannot legally consent to sexual contact, harassment, or abuse from a prison guard. This is because the power difference between inmates and guards is so extreme that it negates any ability to consent. Even sexual contact that would be considered consensual in other circumstances is not consensual in the context of an inmate. Plaintiff did not consent to any of the sexual contact between her and A.C.

78. The actions of GARCIA, SILVA, and DOES 1 through 10 deprived Plaintiff of her Eight Amendment rights.

79. GARCIA failed to supervise and train FCI DUBLIN COs to prevent sexual abuse, despite being aware of the "rape club" culture at the prison. GARCIA ratified the conduct of SILVA and other COs engaged in sexual abuse of inmates

by personally participating in the same conduct.  GARCIA also failed to comply with his duties under the PREA to help detect and prevent sexual abuse. GARCIA's failures also helped to cause SILVA's deprivation of Plaintiff's rights.

80.    On multiple occasions, SILVA made nonconsensual, made offensive sexual contact with Plaintiff and engaged in sexual conduct for his own sexual gratification and for the purpose of humiliating, degrading, or demeaning Plaintiff. At the time, she was an inmate and he was a CO with substantial power over her.

81.    GARCIA, SILVA, and DOES 1 through 10 acted under color of law, in that they were acting or purporting to act in the performance of their official duties as BOP employees.

82.    Defendants' actions and omissions created a substantial risk of serious harm to female inmates like Plaintiff.  Due to their PREA training, Defendants were aware of that substantial risk, and yet they failed to take reasonable measures to abate the risk. In fact, they were deliberately indifferent to that risk by consciously choosing to disregard their duties under federal law.

83.    Plaintiff lacks a statutory cause of action, or an available statutory cause of action does not provide a meaningful remedy; thus, an appropriate remedy, namely damages, can be imposed by this Court.

84.    As a direct and legal result of the aforementioned acts and omissions of the Defendants, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

85.    The conduct of GARCIA, SILVA, and DOES 1 through 10 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff.  It therefore warrants the imposition of exemplary and punitive damages against them.

//

//

## SECOND CAUSE OF ACTION

## GENDER VIOLENCE

## Cal. Civ. Code § 52.4

## (Against Defendant SILVA)

86. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

87. At all relevant times mentioned in this Complaint, California Civil Code § 52.4 was in full force and effect and was binding on SILVA.

88. SILVA committed a physical intrusion and/or physical invasion of a sexual nature against Plaintiff under coercive conditions. Specifically, he engaged in oral sex with her and groped her breasts, both without consent.

89. SILVA also committed against Plaintiff a criminal offense that has an element of the use, attempted use, or threatened use of physical force against the person of another.

90. SILVA committed these acts against Plaintiff at least in part because of her gender.

91. SILVA's acts were not discretionary or a policy judgment, as he knew such conduct was prohibited by the PREA, BOP policies, and state and federal law.

92. As a direct and legal result of the aforementioned acts and omissions of SILVA, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

93. The conduct of SILVA was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

94. Plaintiff further seeks attorneys' fees and costs, as expressly authorized by the statute.

//

**THIRD CAUSE OF ACTION**

**SEXUAL BATTERY**

**Cal. Civ. Code § 1708.5**

**(Against Defendant SILVA)**

95. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

96. On numerous occasions, SILVA acted with the intent to cause a harmful or offensive contact with Plaintiff's breasts, and a sexually offensive contact resulted.

97. On numerous occasions, SILVA acted with the intent to cause a harmful or offensive contact with Plaintiff by the use of his penis, and a sexually offensive contact with Plaintiff resulted.

98. SILVA also acted with intent to cause an imminent apprehension of sexual assault and sexually offensive contact with Plaintiff resulted.

99. SILVA's offensive contact would offend a reasonable sense of personal dignity and lacked any penological justification.

100. SILVA's acts were not discretionary or a policy judgment, as he knew such conduct was prohibited by the PREA, BOP policies, and state and federal law.

101. As a direct and legal result of the aforementioned acts and omissions of SILVA, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

102. The conduct of SILVA was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

103. This action arises out of the commission of a felony. Plaintiff is therefore entitled to reasonable attorneys' fees incurred in prosecuting this action pursuant to Cal. Code of Civil Procedure § 1021.4, according to proof.

**FOURTH CAUSE OF ACTION**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**California Common Law**

**(Against Defendant SILVA, GARCIA, and DOES 1 through 10)**

104. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

105. SILVA, GARCIA, and DOES 1 through 10, inclusive, engaged in willful misconduct that was outrageous and offensive.

106. SILVA, GARCIA, and DOES 1 through 10, inclusive, intended to cause and/or acted with reckless disregard of causing severe emotional distress to Plaintiff.

107. As a direct and legal result of the aforementioned willful misconduct of SILVA, GARCIA, and DOES 1 through 10, Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

108. The conduct of SILVA, GARCIA, and DOES 1 through 10 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

109. This action arises out of the commission of a felony. Plaintiff is therefore entitled to reasonable attorneys' fees incurred in prosecuting this action pursuant to Cal. Code of Civil Procedure § 1021.4, according to proof.

**FIFTH CAUSE OF ACTION**

**BATTERY**

**California Common Law**

**(Against Defendant SILVA)**

110. Plaintiff incorporates by reference all previous paragraphs as if fully

stated herein.

111. SILVA touched Plaintiff and/or caused Plaintiff to be touched with the intent to harm or offend her. Specifically, he touched her breasts and touched her with his penis.

112. Plaintiff did not consent to the touching. As an inmate at a correctiona facility, she could not legally consent. The touching had no legitimate penological purpose.

113. Plaintiff was harmed and offended by SILVA's conduct, and a reasonable person in Plaintiff's situation would also have been offended by the touching.

114. As a direct and legal result of the aforementioned acts and omissions of SILVA, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

115. The conduct of SILVA was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

116. This action arises out of the commission of a felony. Plaintiff is therefore entitled to reasonable attorneys' fees incurred in prosecuting this action pursuant to Cal. Code of Civil Procedure § 1021.4, according to proof.

## FTCA ADMINISTRATIVE EXHAUSTION

117. Plaintiff's remaining claims are asserted against DEFENDANT the UNITED STATES pursuant to the FTCA.

118. Plaintiff has administratively exhausted all her claims against the UNITED STATES as required by the FTCA.

119. Plaintiff submitted her "Claim for Damage, Injury, or Death" to the UNITED STATES and BOP on January 10, 2023. The Claim was in the amount of $10,000,000.

120. The BOP acknowledged receipt of Plaintiff's claim on January 17, 2023.

121. Under the FTCA (28 U.S.C. § 2675(a)), if a federal agency fails to issue a final disposition on a claim within six months, a Plaintiff may consider this a final denial of her claim. The BOP has neither accepted or denied Plaintiff's claim and over six months has passed. Thus, Plaintiff considers this a final denial of her claim such that she may bring her claim in this Court.

**SIXTH CAUSE OF ACTION**

**NEGLIGENCE**

**FTCA / California Common Law**

**(Against Defendant the UNITED STATES)**

122. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

123. Because she was an inmate at a federal prison run by the BOP, Plaintiff was at all relevant times in the custody and care of the UNITED STATES.

124. Because of the special relationship between a jailer and prisoner, the UNITED STATES, including its employees GARCIA and SILVA, had a common law duty of care under California law to protect Plaintiff from foreseeable harm. Sexual assault, harassment, and abuse of female inmate by male COs was a foreseeable harm of which the UNITED STATES was aware. The BOP was specifically aware of the risk to female inmates based not only on the PREA, but on its knowledge of prior incidents of sexual assault of female inmates in the 1990s and 2000s. California negligence law does not require the UNITED STATES to have had actual knowledge of SILVA's abuse of Plaintiff, but nevertheless, the UNITED STATES knew or should have known of what SILVA was doing because of the widespread prison rumors about him and multiple female inmates, as well as his flagrant behavior in spending time with Plaintiff in areas where she was not allowed to be. The UNITED STATES further had actual knowledge that Plaintiff

had multiple risk factors for being a victim of sexual assault.

125. Further, the UNITED STATES, including its employees GARCIA and SILVA, had additional mandatory statutory duties of care to Plaintiff based on PREA regulations and BOP policy to protect Plaintiff from the known risk of sexual assault, harassment, and abuse. These duties required it to provide proper training and supervision of COs and to properly investigate allegations of sexual abuse.

126. The UNITED STATES breached these duties. The BOP as an agency failed to properly monitor, assess, and address its widespread problem with female inmates being sexual assaulted, especially at prisons with recurring issues like FCI DUBLIN. It failed to sufficiently train supervisory FCI DUBLIN employees such as GARCIA, resulting in GARCIA himself engaging in sexual abuse of his wards. It also lacked an effective system for checking to ensure the validity of PREA audits, instead allowing an abusive warden to falsify his report for multiple years, without any knowledge of the BOP. It further failed to provide sufficient security measures at FCI DUBLIN, including but not limited to adequate security camera coverage to eliminate unmonitored areas that provided a safe haven for perpetrators. The BOP also failed to take adequate steps to address complaints of misconduct, resulting in a backlog of thousands of complaints, and it failed to sufficiently analyze those complaints in order to detect patterns of misconduct by prisons or officers. It failed to properly screen potential employees, failing to research the backgrounds, histories, qualifications, and competence of COs that were hired. And the BOP further failed to properly discipline and terminate COs who engaged in misconduct and retaliation against those who spoke out against misconduct. Instead, it made reckless and dangerous decisions to transfer those COs to a new unit or even new prison—thus giving them the opportunity to find a new set of victims.

127. GARCIA failed in his duties as warden to take reasonable measures to reduce the risk of sexual abuse to Plaintiff and protect her safety. He failed to

comply with his duties under the PREA to conduct an honest and accurate audit of FCI DUBLIN so that the BOP could take remedial action. GARCIA further failed to properly train and supervise his COs, and instead participated in and fostered a culture in which the prison was referred to as "the rape club" or the "playground," insinuating that the women were objects for the COs to play with. His own sexual abuse of inmates ratified the sexual misconduct of his inferiors, as it demonstrated that there would be no consequences for it. He further failed to ensure there was effective supervision to protect the inmates, such as by monitoring work assignments, conducting investigations into suspected sexual abuse, and prohibiting male COs from having such unlimited access to the women without supervision. GARCIA further failed to ensure that COs like SILVA could not bring contraband onto the property, which they could then use to facilitate sexual abuse. GARCIA allowed SILVA to be assigned as the sole CO in various women's units, despite the knowledge that SILVA was suspected to have engaged in sexual abuse of inmates. GARCIA failed to investigate SILVA's misconduct or discipline and terminate him based on his actions.

128. As a direct and legal result of the aforementioned negligence of the UNITED STATES, Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

**SEVENTH CAUSE OF ACTION**

**FTCA / Cal. Civ. Code § 1708.5**

**(Against Defendant the UNITED STATES)**

129. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

130. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or

wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendant SILVA.

131. On numerous occasions, SILVA acted with the intent to cause a harmful or offensive contact with Plaintiff's breasts, and a sexually offensive contact resulted.

132. On numerous occasions, SILVA acted with the intent to cause a harmful or offensive contact with Plaintiff by the use of his penis, and a sexually offensive contact with Plaintiff resulted.

133. SILVA also acted with intent to cause an imminent apprehension of sexual assault and sexually offensive contact with Plaintiff resulted.

134. SILVA's offensive contact would offend a reasonable sense of personal dignity and lacked any penological justification.

135. SILVA's acts were not discretionary or a policy judgment, as he knew such conduct was prohibited by the PREA, BOP policies, and state and federal law.

136. As a direct and legal result of the aforementioned acts and omissions of SILVA, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

## EIGHTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## FTCA / California Common Law

## (Against Defendant the UNITED STATES)

137. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

138.   Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendants SILVA, GARCIA, and any later-identified DOE Defendant COs.

139.   SILVA, GARCIA, and DOES 1 through 10 engaged in willful misconduct that was outrageous and offensive.

140.   SILVA, GARCIA, and DOES 1 through 10 intended to cause and/or acted with reckless disregard of causing severe emotional distress to Plaintiff.

141.   As a direct and legal result of the aforementioned conduct of SILVA, GARCIA, and DOES 1 through 10, Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

## NINTH CAUSE OF ACTION

### FTCA / Bane Act, Cal. Civ. Code § 52.1

142.   Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

143.   Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendant

SILVA.

144. Under Cal. Civil Code §52.1, it is a civil rights violation for any person to interfere with the exercise or enjoyment by an individual of her rights secured by the U.S. Constitution or state or federal law. This includes any interference with these rights by threats, intimidation, coercion, or attempted threats, intimidation, or coercion.

145. SILVA interfered with Plaintiff's right to be free from cruel and unusual punishment under the U.S. Constitution and her right to be free from cruel *or* unusual punishment under the California Constitution. He interfered with those rights by the use of actual and attempted threats, intimidation, or coercion.

146. As a direct and legal result of the aforementioned conduct of SILVA, Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

147. Further, Plaintiff is entitled to the statutory civil penalties and attorneys' fees and costs as set forth in § 52.1.

## PRAYER FOR RELIEF

Plaintiff A.C. prays for judgment as follows:

1) For compensatory, general, and special damages, including past, present, and future damages, in an amount in accordance to proof;
2) For punitive damages as permitted by law;
3) For reasonable costs as permitted by law;
4) For attorneys' fees under 28 U.S.C. § 2678, Cal. Civ. Code §§ 52.1, 52.4, and 1021.4; and
5) For any other relief that is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims so triable.

Respectfully submitted,

Date: September 13, 2023

/s/ *Alana L. McMains*

**Alana L. McMains**
Attorney for Plaintiff

27
COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL